UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
THE CITY OF NEW YORK,

                          Plaintiff,

           -against-

BLUE RAGE, INC. d/b/a The Cop Shop,
SALVATORE PICCOLO and SUSAN PICCOLO,

                      Defendants.
---------------------------------------------------------------X

**MEMORANDUM & ORDER**
17-CV-3480 (SJF)(AYS)

**FILED**
**CLERK**

1/27/2020 11:23 am

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

FEUERSTEIN, District Judge:

Plaintiff the City of New York ("Plaintiff" or the "City") commenced this action against

defendants Blue Rage, Inc. d/b/a The Cop Shop ("Cop Shop"), Salvatore Piccolo ("Salvatore"),

and Susan Piccolo[1] ("Susan") (collectively "Defendants") alleging, *inter alia,* violations of the

Lanham Act, 15 U.S.C. §1051, *et seq.*, and of state law.   Currently before the Court are the

parties' cross-motions for summary judgment.  *See* Plaintiff's Motion, Docket Entry ("DE")

[42]; Defendants' Motion, DE [54].   For the reasons set forth below, Plaintiff's motion is

granted in part and denied in part, and Defendants' motion is denied in its entirety.

# I.  BACKGROUND

## A.  Factual History[2]

### 1.  The City's Trademark Registrations

The City, which holds various trademarks obtained through registration with the United

States Patent and Trademark Office ("PTO"), claims that Defendants have sold products that are

---

[1] While Defendants in their papers and declarations spell this Defendant's name as "Suzzanne," the Court will use the spelling "Susan" as reflected in the case caption.

[2] The facts are undisputed unless otherwise noted and are drawn from: (1) the parties' Local Civil Rule 56.1 Statements of Undisputed Facts and Responses relating to Plaintiff's motion, *see* Plaintiff's Rule 56.1 Statement ("Pl. 56.1 Stmt"), DE [44]; Defendants' Response and Counterstatement to Plaintiff's

marked with the trademarked logos and/or emblems.  The City claims ownership of all trademarks, logos, names and insignia associated with the New York Police Department (the "NYPD Trademarks"), including the abbreviation NYPD (the "NYPD Mark") and a design consisting of the words "POLICE DEPARTMENT CITY OF NEW YORK around a shield design (the "NYPD Shield," below):



The federal trademark registrations are for the NYPD Mark, the NYPD Shield, and one for each of seven specialized NYPD units (mounted, emergency squad, special operations division, aviation, bomb squad, harbor unit, highway patrol, collectively "NYPD Units") and pertain to the use of the marks in various classes of souvenir merchandise.

The City also asserts ownership over all trademarks, logos, names, and insignia associated with the Fire Department of the City of New York, including the abbreviation "FDNY" (the "FDNY Mark"), and a distinctive shield with the words FIRE DEPARTMENT CITY OF NEW YORK , the colors red, white, and blue, and a stylized Maltese cross with flames inside over a representation of the New York City skyline (the "FDNY Shield," below):

---

Rule 56.1 Statement ("Def. Resp/Counterstmt"), DE [49]; Plaintiff's Response to Defendants' Counterstatement ("Pl. Resp."), DE [52]; (2)  the parties' Local Civil Rule 56.1 Statements of Undisputed Facts and Responses relating to Defendants' motion, *see* Defendants' Rule 56.1 Statement ("Def. 56.1 Stmt"), DE [54-1]; Plaintiff's Response and Counterstatement to Defendants' Rule 56.1 Statement ("Pl. Resp/Counterstmt"), DE [55]; Defendants' Response to Plaintiff's Counterstatement ("Def. Resp."), DE [56-1]; (3)  Declaration of Gerald Singleton in Support of Plaintiff's Motion ("Singleton Decl."), DE [43]; Declaration of Gerard F. Dunne in Opposition ("Dunne Decl."), DE [46]; and Declaration of Salvatore Piccolo in Opposition ("Salvatore P. Decl."), DE [47].



The City additionally claims ownership over the number 343 (the "343 Mark") representing the number of FDNY members who died in the line of duty on September 11, 2001, and a Maltese cross design containing the letters FDNY (the "FDNY Maltese Cross"):



The City holds numerous federal trademark registrations for the FDNY Mark, the FDNY Shield, the FDNY Maltese Cross, and the 343 Mark in various classes of souvenir merchandise.

Registrations for one or more of the marks designate eleven (11) classes of merchandise:[3] International Class 006 metal goods including key chains, key rings, holiday ornaments ("Class 006/Metal goods"); International Class 009 electric and scientific apparatus including thermometers not for medical use, mouse pads, decorative refrigerator magnets, children's videotapes, children's educational software, videotapes featuring public safety and health information ("Class 009/Scientific goods"); International Class 014 jewelry including lapel pins, costume jewelry, cuff links, pendants, tie clips, tie pins ("Class 014/Jewelry"); International Class 016  including calendars, notepads, pens, pencils, pencil boxes, stickers, bumper stickers,

---

[3]The merchandise listed herein is not a comprehensive list of every type item for every class.  In addition, the registrations of some marks add specific items.  For example, the Class 025/Clothing description for the FDNY Mark adds, *inter alia,* head wear, warm up suits, and wind resistant jackets, and pants, and the description for Class 028/Toys adds toys such as vehicles, toy fire helmets, playing cards, and jigsaw puzzles.

decals, books, magazines, and brochures featuring information on fire safety ("Class 016/Decals");  International Class 18 including sports bags and umbrellas ("Class 018/Bags"); International Class 020 furniture and articles not otherwise classified including plastic key chain tags, cushions, plastic figurines, picture frames ("Class 020/Misc."); International Class 021 housewares and glasses, mugs, lunch boxes, thermal insulated containers for food and beverages, drinking glasses, commemorative plates, decorative plates, souvenir plates ("Class 021/Housewares"); International Class 24 for blanket throws ("Class 024/Blankets") for the FDNY Mark only; International Class 025 clothing including caps, t-shirts, sweatshirts ("Class 025/Clothing"); International Class 026 for cloth patches for clothing ("Class 026/Cloth Patches"); International Class 028 toys and sporting goods including model cars, stuffed animals, dolls and accessories, articulated toy figurines, toy banks, Christmas tree ornaments ("Class 028/Toys").

Class 025/Clothing is the only class for which all the marks have registered.  The following chart depicts the classes, which marks are registered in the class, and the date of first registration of that mark:

| Class of merchandise | Marks registered (Registration Yr) |
|---|---|
| 006/Metal goods | NYPD Mark (2005); NYPD Shield (2006); FDNY Mark (2005); FDNY Shield (2006) |
| 009/Scientific goods | NYPD Mark (2005); NYPD Shield (2006); FDNY Mark  (2005); FDNY Shield (2006) |
| 014/Jewelry | NYPD Mark (2005); NYPD Shield (2006); FDNY Mark  (2005); FDNY Shield (2006); FDNY Maltese Cross (2009); 343 Mark (2015) |
| 016/Decals | FDNY Mark  (2005); FDNY Shield (2006); 343 Mark (2015) |
| 018/Bags | FDNY Mark  (2005); FDNY Shield (2006) |

| | |
|---|---|
| 020 /Misc. | NYPD Mark (2005); NYPD Shield (2006); FDNY Mark  (2005); FDNY Shield (2006) |
| 021/Housewares | NYPD Mark (2005); NYPD Shield (2006); FDNY Mark  (2005); FDNY Shield (2006) |
| 024/Blanket throws | FDNY Mark (2005) |
| 025/Clothing | NYPD Mark (2005); NYPD Shield (2006); NYPD Units (2009 or 2010); FDNY Mark (2002); FDNY Shield (2006); FDNY Maltese Cross (2007); 343 Mark (2017) |
| 026/Cloth patches | FDNY Mark (2005); FDNY Shield (2006) |
| 028/Toys | NYPD Mark (2005); NYPD Shield (2006); FDNY Mark (2005); FDNY Shield (2006); FDNY Maltese Cross (2009) |

In addition to the class of merchandise, each registration includes the year that the mark was first used in commerce for merchandise in that class.  According to the registrations, the majority of the marks were first used in commerce in 2000 or later, with the following exceptions:

| Mark | 1st Use in Commerce - Class |
|---|---|
| NYPD Shield | 1971 - 025/Clothing |
| NYPD Mark | 1993 - 025/Clothing |
| FDNY Shield | 1994 - 025/Clothing<br>1999 - 020/Misc. & 028/Toys |
| FDNY Mark | 1996- 025/Clothing & 016/Decals<br>1999 –006/Metal goods, 020/Misc., & 028/Toys |

Defendants do not dispute that the City has registered trademarks for the marks to the extent set forth in the various registrations.  They dispute, however, that the City owns the abbreviations and all logos, names and insignia associated with the NYPD and FDNY.   They further argue that Defendants used the marks in commerce prior to 2000.

The City operates an extensive merchandise licensing program administered by NYC & Company as exclusive agent for the licensing of the City's various trademarks.  Officially

licensed souvenir merchandise with the NYPD and FDNY trademarks are sold to the general public.  This merchandise generally has a hologram, hangtag, label and/or packaging identifying the NYPD and FDNY trademarks as trademarks owned by the City.

The City engages in extensive advertising to promote the sale of officially licensed NYPD and FDNY souvenir merchandise.  There are forty-five (45) licensees that, having been brought into the program by public process in conformance with the City's charter and concession rules, distribute officially licensed NYPD and FDNY merchandise in the United States.  In addition, there are twenty-seven (27) international licensees who distribute such merchandise in Europe, Australia, China, and Japan.  The City's trademark licensing program generates annual retail sales of tens of millions of dollars, the vast majority attributable to the sale of officially licensed NYPD and FDNY souvenir merchandise.

2.  The Cop Shop

Defendant Salvatore Piccolo owns, and is the Chief Executive Officer of, defendant Blue Rage, which does business as the Cop Shop.  His wife, Susan Piccolo, is a manager at the Cop Shop.  The Cop Shop operates a retail store located at 560 Broadway, Massapequa, New York, and in addition, defendants operate a website.  Prior to opening the storefront, Salvatore, who retired in 2001 after twenty years as a Transit Policeman for the City, began making and selling t-shirts to fellow members of the transit bureau police force in or about 1987.  He also printed and sold t-shirts, referred to as "house," "precinct" or "buff" shirts, designed and ordered by individual precincts or firehouses.  Deposition of Salvatore Piccolo ("Salvatore P. Dep."), at 38, Singleton Decl., Ex. B.[4]

_____

[4] The City does not claim that t-shirts commissioned by individual precincts or fire stations violate its marks and makes no claim in this regard.

Salvatore testified about an incident in 1990 wherein he was in front of the precinct on his day off selling t-shirts with the Transit Police logo.  Salvatore P. Dep. at 45-47.   His superior, Chief O'Connor, observed the activity and asked Salvatore who had given him permission to sell the shirts, to which Salvatore responded that he did not need permission.  When O'Connor tried to transfer Salvatore's duty station, the latter called William Bratton, then Commissioner of the Transit Police.[5]  During the call, Salvatore asked Bratton "for permission to use the transit police shield and [Bratton] says I didn't need permission to use the transit police shield because it was a City logo and it was owned by the people of the City of New York."  *Id.* at 43.  Salvatore took this to constitute permission to sell anything with the transit police logo.  *Id.* at 95; Salvatore P. Decl., ¶34.[6]

In 1995, the Transit Police, which was previously a separate unit, merged with the NYPD.  That year, Susan wrote to Bratton because she wanted to make sure they "were allowed to do that we were doing with no problems because they were all merged into one.  So I wanted to make sure we could still use the transit, the housing, etc."  Susan P. Dep. 61-62.   It was a "short letter" in which she asked Bratton "if we could still use all those logos or we just had to use the NYPD logo."  Deposition of Susan Piccolo ("Susan P. Dep."), at  63, Singleton Decl., Ex. C.  Susan claims Bratton wrote a response in which he said they could keep using the logo as long as they did not disgrace the department.  *Id.* at 71-72.  Defendants do not have a copy of

---

[5] Salvatore testified that at some time prior to 1990 he had sent some items to Bratton as a gift –"a tie clip, baseball cap and maybe something else; I don't remember what it was."  Salvatore P. Dep. at 39.  There is no indication of what, if any, logos or wording was used on these items.  He claims to have received a written thank you note from Bratton.  *Id.* at 40.

[6] The transit police logo used by Defendants prior to 1995 is no longer in use and is not at issue in this litigation.  This discussion is offered only to examine Defendants' evidence regarding which logos they were using and when.

either Susan's letter or Bratton's response.  Defendants have never had any communications with Bratton regarding the use of any FDNY marks.  Defendants' Response to Requests to Admit ("RFA Resp.") ¶19, Singleton Decl. Ex. A.

The City has submitted a declaration from Commissioner Bratton in which he states, *inter alia,* that (1) he does not recall having met or spoken with Defendants; (2) he would not have given permission for Defendants to use NYPD marks for merchandising nor told them they were free to do so because he did not possess authority to give such permission; and (3) he would not have told Defendants that the NYPD insignia could be freely used due to concerns regarding criminal impersonation.  *See* Declaration of William J. Bratton, Singleton Decl., Ex. K.

At some unspecified time, Defendants' activities "developed into a business for making t-shirts and other insignia related items such as baseball-style hats, coffee mugs and trinkets all decorated with symbols used by New York City Police Department and the Fire Departments of the City of New York."  Declaration of Salvatore Piccolo in Opposition ("Salvatore P. Decl."), ¶2, DE [47].  Defendants claim that, by "at least 1995," Blue Rage, through its predecessors, has been selling essentially the same items as it presently sells "bearing the insignia of, among others, the NYPD and FDNY, applied as decoration to such items in order to identify the New York City Police Department and the Fire Department of the City of New York."  Def. Resp/Counterstmt, ¶36.  In response, the City "does not dispute the fact that, since 1995, Defendants have been selling essentially the same items it is now selling bearing marks associated with the NYPD and FDNY."  Pl. Resp., ¶36.  There are no specific indications in the record as to when Defendants began to sell each type of merchandise, which logos or insignia they used, or how consistently they made any sales.

Defendants "do not contest they make and sell a wide variety of unlicensed merchandise bearing the NYPD and FDNY trademarks" through the retail store, but deny selling such merchandise online.  Def. Resp/Counterstmt ¶17.  They concede that the Cop Shop sells both licensed unlicensed merchandise, but state that they "label clearly whether the merchandise is licensed from the City of New York, or not."  Salvatore P. Decl. ¶27.  A placard is posted in a display case in the store that states:

**Some of the Various NYPD**

**and FDNY products Sold in**

**this store. Are sold as**

**decoration and not a brand.**

**Thank you.**

**Blue Rage Inc (The Cop Shop).**

Singleton Declaration, ¶43.  Defendants also make t-shirts at the request of various precincts or firehouses to be used as fundraisers or worn by the unit members and their families.  The City acknowledges that various NYPD and FDNY fraternal organizations have permission to make and sell merchandise bearing the NYPD or FDNY marks at organization events, but notes that such merchandise may not be sold to the general public.  While Defendants state that the Cop Shop is "not a souvenir shop" but rather a police supply store that sells police uniforms and related items, Pl. Reply. ¶48, they do not dispute that the store is open to the general public.[7]

---

[7]Defendants also make uniforms and other items for use by the Fire and Police Departments directly.  The City acknowledges this conduct and states that "items that are made for official governmental use are not in issue."  Pl. Resp., ¶42.

3.  Pre-Litigation Conduct Between the Parties

On March 4, 2014, the City sent a cease and desist letter to Defendants regarding the sale of unlicensed and unauthorized merchandise bearing the NYPD and FDNY trademarks.  A follow-up letter sent to Defendants by the City's attorneys on or about December 11, 2014 threatened commencement of a civil trademark infringement action should Defendants continue to sell the merchandise.

A telephone call between the City's attorney and Susan took place on or about December 22, 2014 at which time, the City claims, Susan advised that the merchandise referenced in the March 4, 2014 letter had been donated and that the Cop Shop was no longer in possession of unlicensed merchandise bearing the NYPD or FDNY marks.  On or about January 30, 2015, the City's attorney spoke by telephone with Salvatore who, according to the City, advised that the Cop Shop was no longer selling any unlicensed merchandise bearing the NYPD or FDNY marks. Defendants claim that any references to unlicensed merchandise made during these telephone calls pertained only to goods presented for sale online.  As a result of these calls, Defendants have "refrained from listing any of what the City calls 'unlicensed' merchandise on Blue Rage Inc. website.  Such merchandise is sold only locally in Blue Rage Inc. store or when Blue Rage Inc. attends local trade shows and exhibitions."  Def. Resp/Counterstmt, ¶48.

On June 15, 2016 and May 17, 2017, investigators from NYC & Company, the City's licensing agent, visited the Cop Shop and observed and photographed substantial quantities of unlicensed souvenir merchandise for sale bearing the NYPD or FDNY marks.  The City commenced this litigation on June 9, 2017.  At subsequent inspections conducted on October 2 and 6, 2017, substantial quantities of unlicensed merchandise were observed and photographed.

10

Defendants do not dispute that the Cop Shop sells unlicensed merchandise, but contend that they "do not operate a souvenir store" and that the merchandise "was sold to members and their families of uniform services of the NYPD and FDNY to signify their affiliation with the service." Def. Resp/Counterstmt ¶¶22-24 (Defendants "make and sell a wide variety of merchandise bearing the NYPD and FDNY trademarks, which they sell side-by-side and in close proximity to officially licensed NYPD and FDNY merchandise"). They contest, however, that the unlicensed merchandise "had been sold as souvenir merchandise" and that it "has been sold without the City's consent." *Id.* ¶24. Making a distinction between the NYPD and FDNY "marks" and "logos," Defendants deny any use of the marks as trademarks or brands, but "admit their use of NYPD and FDNY logos for merchandise, including mugs, apparel items and greeting cards." RFA Resp., ¶39. They further admit that they did not comply with the City's demands that they stop selling merchandise with the NYPD and FDNY logos. *Id.* ¶35. In addition, they argue that they were selling goods with the NYPD and FDNY marks prior to the dates of first use in commerce set forth in the trademark registrations.

## B.  Procedural History

The City filed its complaint on June 9, 2017, asserting six (6) causes of action against Defendants: (1) trademark infringement under Section 32 (1)(a) of the Lanham Act, 15 U.S.C. § 1114 (1)(a); (2) false designation of origin and/or false description or representation in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (3) trademark dilution in violation of 15 U.S.C. § 1125(c); (4) common law unfair competition; (5) trademark infringement in violation of New York General Business Law § 360-k; and (6) deceptive trade practices and false advertising under New York General Business Law §§ 349, 350, and 350-e. The complaint seeks, *inter alia,* injunctive relief and damages.

In their Amended Answer, Defendants raised several defenses including, *inter alia,* (1) that their sale of merchandise constitutes continued use within the meaning of 15 U.S.C. § 1115(b)(5); (2) that they had permission from Commissioner Bratton to use the NYPD trademarks; (3) that registration of trademarks of an insignia or municipality is prohibited by federal regulation; (4) laches due to the City's delay in enforcement efforts; (5) that the City's has "unclean hands" as the trademark registrations were fraudulently obtained and misused; (6) that they provide "disclaimers" as to the presence of unlicensed merchandise to preclude any likelihood of confusion; and (7) that the City is estopped from raising claims as waived by its prior actions.  Defendants further asserted a single counterclaim seeking cancellation of the trademark registrations as fraudulently obtained and sought injunctive and monetary relief. Amended Answer, DE [17].

After completion of discovery, the parties cross-moved for summary judgment.  The City seeks summary judgment on its federal Lanham Act claims only and further seeks dismissal of Defendants' counterclaim.  Defendants' motion seeks summary judgment on the federal claims in their favor.

## II.  LEGAL STANDARD

"Summary judgment must be granted where the pleadings, the discovery and disclosure materials on file, and any affidavits show 'that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting FED. R. CIV. P. 56(a)).   In deciding a motion for summary judgment, "the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted);

*see also Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (the court must not "weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." (quoting *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir. 1996))).

"The moving party bears the burden of establishing the absence of any genuine issue of material fact." *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010). If the moving party satisfies its initial burden, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006).  "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 558 (2d Cir. 2012) (internal quotation marks omitted); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986) (a motion for summary judgment should be denied if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").  All facts under consideration must be directly supported by admissible evidence.  *See* FED. R. CIV. P. 56(c).

The party opposing summary judgment must, however, "do more than simply show that there is some metaphysical doubt as to the material facts" but rather "must come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (emphasis in original) (internal quotation marks omitted); *see also Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) (noting that "[c]onclusory allegations, conjecture,

13

and speculation ... are insufficient to create a genuine issue of fact" (citation omitted)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (quoting *Anderson*, 477 U.S. at 252) (alterations in original). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007).

Moreover, "[w]here the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements become immaterial and cannot defeat a motion for summary judgment." *Chandok v. Klessig*, 632 F.3d 803, 812 (2d Cir. 2011); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (holding that summary judgment is appropriate when the non-moving party has failed to make a sufficient showing on an essential element for which it bears the burden of proof).

## III.  DISCUSSION

### A.  Lanham Act – Trademark Infringement and False Designation of Origin

The City claims that Defendants have engaged in trademark infringement in violation of Section 32 of the Lanham Act, which prohibits the commercial use, without consent, of any "reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods" where "such use is likely to cause confusion, or to cause mistake, or to deceive."  15 U.S.C. § 1114 (1)(a).  A counterfeit mark is defined by statute as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark."  15 U.S.C. § 1127.

14

The City also asserts a false designation of origin claim under Section 43 of the Lanham Act, which provides for liability where a person in connection with any goods,

> uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which ... is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship or approval of his or her goods, services or commercial activities by another person ...

15 U.S.C. § 1125(a)(1). The false designation of origin provision has "two purposes: 'to prevent consumer confusion' and 'to protect 'the synonymous right of a trademark owner to control his product's reputation.'" *Beastie Boys v. Monster Energy Co.*, 66 F. Supp. 3d 424, 445 (S.D.N.Y. 2014) (quoting *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 205 (2d Cir.1979) (internal quotation marks and citations omitted); *see also Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.,* 469 U.S. 189, 198, 105 S. Ct. 658, 83 L. Ed. 2d 582 (1985) (Lanham Act "provides national protection of trademarks in order to secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers"). A Lanham Act claim under Section 43(a) includes claims for false implied endorsement where a company or individual uses "another's trademark to suggest an association without explicitly stating that a sponsorship or affiliation exists." *Beastie Boys* 66 F.Supp.3d at 446; *see also Dallas Cowboy Cheerleaders,* 604 F.2d at 205 (finding an implied association actionable under § 43(a) because it causes consumer confusion and "has a tendency to impugn (plaintiff's services) and injure plaintiff's business reputation" (internal quotations marks and citation omitted)).

While the trademark infringement and false designation of origin provisions differ in that the latter claim, under §1125(a), applies to both registered and unregistered trademarks, "the

legal standard to establish liability is the same under both sections." *Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, 176 F. Supp. 3d 137, 155 (E.D.N.Y. 2016) (internal quotation marks and citation omitted). These claims are analyzed "under a familiar two-prong test [that] looks first to whether the plaintiff's mark is entitled to protection, and second to whether the defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods." *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 102 (2d Cir. 2010) (internal quotation marks and citation omitted).[8]

1.  Marks entitled to protection

It is undisputed that the City has registered the NYPD and FDNY marks for use in commerce. Trademark owners who register their marks are entitled to a presumption of validity as the registration of a mark is "prima facie evidence of the validity of the registered mark and of the registration of the mark." 15 U.S.C. § 1057 (b); *see also Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.,* 192 F.3d 337, 345 (2d Cir. 1999) ("[a] certificate of registration with the PTO is prima facie evidence that the mark is registered and valid (i.e., protectible), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce"). Where the holder of the trademark sues for infringement, the defendant has the burden of rebutting the presumption of the mark's protectability by a preponderance of the evidence. *See Lane Capital Mgmt.*, 192 F.3d at 345; *see also Privado Mktg. Grp. LLC v. Eleftheria Rest Corp.*, No. 13 CIV. 3137 2017 WL 1167332, at *7 (S.D.N.Y. Mar. 27, 2017)

---

[8]State law claims for trademark infringement are analyzed concurrently with the federal trademark infringement claims as the standards are substantially similar. *See Van Praagh v. Gratton*, 993 F. Supp. 2d 293, 301 (E.D.N.Y. 2014); *see also optionsXpress, Inc. v. optionsXpress Inc.,* No. 14-CV-956, 2014 WL 3728637, at *2 (S.D.N.Y. July 28, 2014) ("Because the analysis for trademark infringement under New York common law is the same as federal trademark analysis, the foregoing establishes liability under GBL § 360–k."). Although the City has not expressly sought summary judgment as to its state law infringement claim, the reasoning herein would likely apply to that claim as well.

("when a plaintiff sues for infringement of a registered mark, the defendant bears the burden of production and persuasion to rebut the presumption of ownership").  However, "registration creates no substantive trademark rights against infringement beyond the common law rights acquired through use of the mark." *Excelled Sheepskin & Leather Coat Corp. v. Oregon Brewing Co.,* 897 F.3d 413, 419 (2d Cir. 2019) (quoting *Time, Inc. v. Petersen Pub. Co.,* 173 F.3d 113, 118 (2d Cir. 1999)).  Trademark rights at common law "derive from 'initial appropriation and use [] accompanied by an intention to continue exploiting the mark commercially." *Excelled,* 897 F.3d at 418 (quoting *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.,* 495 F.2d 1265, 1271 (2d Cir. 1974)).  The statutory presumption may be overcome where a party has established trademark rights through prior use.

> a.   *Ownership of the marks*

"Rights in a trademark are determined by the date of the mark's first use in commerce." *Hana Fin., Inc. v. Hana Bank*, 574 U.S. 418, __, 135 S. Ct. 907, 909, 190 L. Ed. 2d 800 (2015). "It is well established that the standard test of ownership is priority of use." *Treeline Imports, Inc. v. Vernikov*, 239 F. Supp. 3d 542, 557–58 (E.D.N.Y. 2017) (internal quotation marks and citation omitted); *see also Haggar Int'l Corp. v. United Co. for Food Indus. Corp.*, 906 F. Supp. 2d 96, 105-06 (E.D.N.Y. 2012) (trademark ownership rights go to the "first-to-use, not [the] first-to-register" (quoting 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 16:18 (4th ed. 2010)).  "[S]o long as a person is the first to use a particular mark to identify his goods or services in a given market, and so long as that owner continues to make use of the mark, he is entitled to prevent others from using the mark to describe their own goods in that market." *ITC Ltd. v. Punchgini, Inc.,* 482 F.3d 135, 147 (2d Cir. 2007) (internal quotation mark and citation omitted).

17

Defendants claim, and the City does not dispute, that since 1995, they have sold essentially the same products. The trademark registrations issued to the City state that the bulk of the marks were first used in commerce in 2000 or later, and registrations for several other classes of merchandise indicate first uses in 1996 and 1999.  While Defendants' undisputed assertion that they have been selling essentially the same products since 1995 barely satisfies their burden of establishing prior use for the purpose of this motion, there is no additional evidence on the current record that would support the determination at this juncture of the senior user of a particular mark on any specified class of goods sold since 1995.  As the City's entitlement to the statutory presumption as to any mark first used since 1995 is at issue, summary judgment on the infringement claim is precluded as to those marks and classes of merchandise.

A different result is warranted as to certain marks first used in commerce by the City *before* 1995.  Specifically, the NYPD Shield, NYPD Mark, and FDNY Shield were all used on clothing prior to 1995.  The only evidence of use of a mark by Defendants prior to 1995 is of the Transit Police logo.  As the City is the senior user of the NYPD Shield, NYPD Mark, and FDNY Shield on clothing, the statutory presumption of validity as to those marks as used on clothing remains.  The City's priority of use of these marks on clothing, however, does not automatically create trademark rights for their use on other classes of merchandise.  "To be sure, the senior user of a mark does not preserve its priority as to expansion into other unrelated goods or services." *Excelled,* 897 F.3d at 418 (citation omitted).  The parties have neither argued nor provided evidence that would permit a finding that the City's trademark rights established as to clothing is appropriately extended to the remaining classes of merchandise.

> b. *Marks are not "insignia"*

Defendants also challenge the marks by arguing that the trademarking of the insignia of a municipality is not permitted under the Lanham Act. *See* 15 U.S.C. § 1052(b) (precluding registration of the "flag or coat of arms or other insignia of the United States, or of any State or municipality"). Clearly, the seal of the City of New York (the "City Seal") could not be registered as a trademark. *See In re City of Houston,* 731 F.3d 1326 (Fed. Cir. 2013); *see also Renna v. Cnty. of Union, N.J.,* 88 F. Supp. 3d 310, 317 (D. N.J. 2014) (noting that the PTO has "correctly and authoritatively interpreted Section 1052(b) as an absolute bar, one that does not list any exceptions that would allow for . . . municipalities to register their own flags or insignia" (internal quotation marks and citation omitted)). The prohibition does not extend to bar marks of departments or agencies within the governments of the United States, a state, or a municipality. Indeed, numerous other trademarks have been issued for such entities by the PTO. *See* Singleton Decl., Ex. M (providing registrations for entities including, *inter alia,* the National Parks Service, the Postal Service, LAPD, County of Los Angeles Fire Department, and Kentucky State Police). The PTO's examining procedures specifically instruct that "[f]lags and coats of arms are specific designs formally adopted to serve as emblems of governmental authority. The wording 'other insignia' should not be interpreted broadly, but should be considered to include only those emblems and devices that also represent governmental authority and that are of the same general class and character of flags and coats of arms." USPTO Trademark Manual of Examining Procedures, §1204.02(a), Singleton Decl. Ex. L.

The Court has further examined the various trademarks to determine whether any has used the City Seal, at left below,[9] in such a way that it could arguably be found to be the use of

_____

[9]This depiction of the City Seal has been taken from the City's website. *See* https://www1.nyc.gov/site /dcas/about/green-book-city-seal-and-flag.page.

the municipality's insignia. Only the NYPD Shield shares elements with the City Seal.



A comparison of the two reveals that the NYPD Shield does not reproduce the City Seal in its entirety, but rather incorporates only a few of its elements in a peripheral manner. Careful scrutiny shows that the "seal" portion of the NYPD Shield is different in shape and depicts two small, solid figures shown in silhouette. The shield between the figures shows only the four windmill blades, and a large bird sits directly atop the shield. The NYPD Shield does not include either the year or the motto shown on the City Seal. In addition, the NYPD Shield includes detail not found on the City Seal, such as a white banner with five stars topped off with the silhouette of the scales of justice. Mere use of select elements from the City Seal does not convert the NYPD Shield into an "insignia" within the meaning of the Lanham Act.

2.  Likelihood of consumer confusion

Having determined that the City's trademarks are entitled to protection to the extent indicated above, the Court turns to the issue of whether Defendants' use of those marks is likely to cause consumers confusion as to the sponsorship or origin of Defendants' merchandise. "Confusion giving rise to a claim of trademark infringement includes confusion as to 'source, sponsorship, affiliation, connection, or identification.'" *River Light V, L.P. v. Lin & J Int'l, Inc.*, No. 13cv3669, 2014 WL 6850966, at *10 (S.D.N.Y. Dec. 4, 2014) (quoting *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 383 (2d Cir. 2005) (internal quotation marks and citation

omitted)); *see also Kelly-Brown v. Winfrey,* 717 F.3d 295, 304 (2d Cir. 2013) (the Lanham Act "protects against direct confusion, where there is a likelihood that consumers will believe that the trademark owner sponsors or endorses the use of the challenged mark" (internal quotation marks and citation omitted)).

Typically, courts in this Circuit evaluate consumer confusion by consideration of the *Polaroid* factors. *See Polaroid Corp. v. Polaroid Elecs. Corp.,* 287 F.2d 492, 295 (2d Cir. 1961). The *Polaroid* factors include: the strength of the plaintiff's mark; the degree of similarity between the two marks; the proximity of the products in the marketplace; the likelihood that the plaintiff will bridge the gap by developing a product for sale in the market of the alleged infringer's product; evidence of actual confusion; bad faith on behalf of the defendant; the quality of the defendant's product; and sophistication of the consumer group. *See Starbucks Corp. v. Wolfe's Borough Coffee, Inc*., 588 F.3d 97, 115 (2d Cir. 2009). "Courts should not treat any one factor as dispositive, nor apply a 'mechanical process' awarding judgment to 'the party with the greatest number of factors weighing in its favor.'" *Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 37 (2d Cir. 2016) (quoting *Nabisco, Inc. v. Warner–Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000)).

It is undisputed that Defendants have utilized the exact marks registered by the City. Where a defendant uses a counterfeit mark, such use is deemed to be inherently confusing to a customer. *See Dish Network L.L.C. v. Siddiqi,* No. 18 CV 4397, 2019 WL 5781945, at *4 (S.D.N.Y. Nov. 6, 2019). Indeed, "confusing the customer is the whole purpose of creating counterfeit goods." *Gucci Am., Inc. v. Duty Free Apparel, Ltd,* 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003). Given the inherent confusion caused by the use of counterfeit marks, it is unnecessary to perform a step-by-step analysis of each *Polaroid* factor. *See Treeline Imports,*

*Inc.,* 239 F. Supp. at 561; *see also Dish Network,* 2019 WL 5781945, at *4 ("it is not necessary to perform the step-by-step examination of each <u>Polaroid</u> factor when a counterfeit mark is at issue" (internal quotation marks and citation omitted)); *Halo Optical Prods., Inc. v. Liberty Sport,Inc.*, 2017 WL 1082443, at *11 (N.D.N.Y. Mar. 22, 2017) ("[W]hen dealing with an identical mark ... courts are not necessarily required to analyze the *Polaroid* factors...."); *Gucci Am.,* 286 F. Supp. 2d at 287 ("the Court need not undertake a factor-by-factor analysis under *Polaroid* because counterfeits, by their very nature, cause confusion").[10]

Defendants argue that its consumers are not confused by the sale of their unlicensed merchandise sold side-by-side with licensed items because they have posted signs that adequately inform the consumer.  In other words, Defendants are arguing that its customers are not confused because Defendants have told them that the goods bear counterfeit marks.  Their use of the signs does not excuse their conduct under the Lanham Act.  *See, e.g., Chanel, Inc. v. Xiao Feng Ye*, No. CV-06-3372, 2007 WL 2693850, at *3 (E.D.N.Y. Sept. 12, 2007) (noting that disclaimer was "essentially an acknowledgment of [defendant's] counterfeiting" and "in no way relieves [defendant] of liability under the Lanham Act").  Courts have rejected attempts to use such signs to inoculate an infringer from liability.  *See, e.g., Chanel, Inc. v. Maslar*, No. 4:07-cv-01033, 2009 WL 10711657, at *3 (S.D. Tex. Nov. 19, 2009) (infringement found despite disclaimer stating, *inter alia,* that the products were "*replicas* as a cheaper alternative for those who wish to enjoy the same fashion and quality without the high price . . . It is not our intention .

---

[10]An analysis of the *Polaroid* factors would likely result in a finding of consumer confusion.  The first four factors weigh heavily in the City's favor: the strength of the City's marks, the use by Defendants of identical marks,  that the merchandise is sold in the same marketplace (side-by-side), and that the City is already competing in that marketplace so there is no gap to bridge.   There has been no evidence presented regarding actual confusion, the quality of the infringing products, or the sophistication of the consumer group and thus those factors do not favor either side.

. . to infringe upon registered trademarks" (emphasis and alterations in original)); *Chanel, Inc. v. Schwartz*, No. 06 Civ. 3371, 2007 WL 4180615 at *5 (E.D.N.Y. Nov. 19, 2007) (inferring that defendant "adopted the disclaimer in anticipation that it would absolve him from liability for the otherwise unlawful sale of counterfeit goods"); *Rolex Watch USA Inc. v. Jones,* No. 99-CIV-2359, 2000 WL 1528263, at *3 n.1 (S.D.N.Y. Oct. 13, 2000) (finding presence of disclaimer on website not evidence of good faith as defendant "clearly sought to capitalize on the value and renown of the plaintiffs' marks").  In fact, the use of such disclaimers has been found to constitute express acknowledgment that a party is "knowingly and intentionally capitalizing on plaintiff's name, reputation and goodwill and that there is indeed a strong likelihood of consumer confusion." *Xiao Feng Ye*, 2007 WL 2693850, at *3; *see also Chanel, Inc. v. Stevens*, No. 07-81201-CIV, 2009 WL 10668566, *5 (S.D. Fla. Oct. 20, 2009) (evidence of disclaimers "bolsters the admissions that Defendant knows the marks were counterfeit and likely to create confusion, yet intentionally offered and sold them anyway" (internal quotation marks and citation omitted)); *Chanel v. Gordashevsky*, 558 F. Supp. 2d 532, 538 (D.N.J. 2008) (use of disclaimer that products were not intended to be represented as originals "indicates [defendant]'s knowledge of [plaintiff]'s trademarks and his intent to capitalize on the value of the marks").  Defendants here state that some of the products are "sold as a decoration and not a brand."  This language does nothing to alleviate confusion on the part of the consumer but rather represents Defendants' attempt to avoid liability for their infringing acts.

In addition, the level of confusion experienced by the in-store consumers at the Cop Shop is not determinative as "[l]ikelihood of confusion does not focus solely on the party purchasing a product from the defendant; 'post sale confusion as well as point-of-sale confusion [is] actionable under the Lanham Act.'"  *Rolex Watch USA Inc.,* 2000 WL 1528263, at *3 n.1

(quoting *Nabisco Inc. v. PF Brands, Inc.,* 191 F.3d 208, 218 (2d Cir. 1999)) (alteration in

original); *see also Maslar,* 2009 WL 10711657, at *8 ("[t]he use of 'replica' disclaimers does not

diminish the likelihood of [consumer] confusion" that may occur post sale).  Use of the City's

marks creates confusion by suggesting that Defendants' products are affiliated with, sponsored

by, or otherwise connected to the City by way of the NYPD and/or FDNY.

     3.  <u>Defendants' additional arguments in opposition</u>

     Defendants make two additional arguments in their opposition to the City's motion.

They argue the trademarks are used as a "functional decoration" to their merchandise and that

such a use cannot constitute trademark infringement, and they suggest that they have used the

marks with permission.[11]

     *a.  Aesthetic functionality*

     Defendants contend that their use of the marks is "decorative and ornamental" and thus is

"fully sanctioned by the trademark laws."  Defendants' Memorandum of Law in Opposition

("Defs' Mem. in Opp.") at 4, DE [50].  Though far from clear, they appear to argue that the

marks are functional within the meaning of trademark law.  "[I]f a markholder has successfully

demonstrated that its mark is valid and that the competitor's mark is likely to cause confusion,

the competitor can nevertheless prevail . . . by showing that the mark is functional."  *Christian*

*Louboutin S.A. v. Yves St. Laurent Am. Holdings, Inc.,* 696 F.3d 206, 217 (2d Cir. 2012) (internal

quotation marks, citation, and alterations omitted).  "'In general terms, a product feature is

functional,' and cannot serve as a trademark, 'if it is essential to the use or purpose of the article

or if it affects the cost or quality of the article,' that is, if exclusive use of the feature would put

---

[11]Any other defenses raised by Defendants in their Answer are deemed abandoned. *See infra,* Section III
C.

competitors at a significant non-reputation-related disadvantage. *Qualitex Co. v. Jacobson Prod. Co.,* 514 U.S. 159, 165, 115 S. Ct. 1300, 131 L. Ed. 2d 248 (1995) (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844,  850, n.10, 102 S. Ct. 2182, 72 L. Ed. 2d 606 (1982)).  The functionality doctrine serves to "prevent advances in functional design from being monopolized by the owner of the design's trade dress in order to 'encourage competition and the broadest dissemination of useful design features.'" *Fabrication Enters., Inc. v. Hygienic Corp.,* 64 F.3d 53, 58 (2d Cir. 1995) (quoting *Warner Bros., Inc. v. Gay Toys, Inc*., 724 F.2d 327, 331 (2d Cir. 1983)).

Functional use may be either (1) traditional or utilitarian in that the feature is "essential to the use or purpose of the article," or (2) aesthetic. *Christian Louboutin,* 696 F.3d at 219.  The Court construes Defendants' statement that the mark is used as a "functional decoration," Mem. in Opp., at 5, as suggesting that the marks have aesthetic functionality.  Whether a mark serves an aesthetic function is highly fact specific and requires a court to "carefully weigh 'the competitive benefits of protecting the source-identifying aspects' of a mark against the 'competitive costs of precluding competitors from using the feature.'" *Christian Louboutin,* 696 F.3d at 222 (quoting *Fabrication Enters.,* 64 F.3d at 59 ).  It must consider "both the markholder's right to enjoy the benefits of its effort to distinguish its product and the public's right to the vigorously competitive market protected by the Lanham Act." *Christian Louboutin,* 696 F.3d at 222 (internal quotation marks and citation omitted) (further noting that courts must "take care to ensure that the mark's very success in denoting (and promoting) its source does not itself defeat the markholder's right to protect that mark.").

Balancing those competing interests here, the marks do not have aesthetic functionality. The marks are clearly source-identifying despite Defendants' unsupported argument that their

use of the NYPD and FDNY marks are "decoration to signify the service."  Defs' Mem. in Opp.

at 3, DE [50].   By Defendants' reasoning, any logo or emblem would be precluded from

trademark protection once it was used to "decorate" or provide "ornamentation" to an item of

merchandise.  They provide no case law to support such an expansive interpretation of aesthetic

functionality.  Moreover, Defendants have not argued, let alone established, that they are unable

to fairly compete with the City in the market for this merchandise.  *See generally Christian*

*Louboutin,* 696 F.3d 223 ("the functionality defense does not guarantee a competitor the greatest

range for [his] creative outlet, but only the ability to fairly compete within a given market"

(internal quotation marks and citation omitted) (alteration in original).  There is ample room for

Defendants to compete in the market without using the City's marks simply by showing some

creativity or inventiveness in their designs.  For example, the registration for the NYPD Shield

expressly states that "no claim is made to the exclusive right to use 'City of New York' and

"Police Department' apart from the Mark as shown," Singleton Decl., Ex. D, leaving avenues

using these phrases for Defendants to explore.

        *b.   Permission to use the marks*

     The Lanham Act provides a defense that "the registered mark is being used by or with the

permission of the registrant or a person in privity with the registrant."  15 U.S.C. §1115(b)(3).

Defendants suggest that there were given permission to use the City's marks by Bratton and/or

then-Mayor Giuliani.  Their assertions do not satisfy their burden as to this defense.  They do not

explain how either would have been vested with the authority necessary to grant permission.  At

best, Defendants have pointed to an issue of fact as to whether Bratton gave them "permission"

to use the Transit Police logo, but have submitted no evidence that a reasonable juror could use

to find that they received permission to use the NYPD or FDNY marks.   To the extent that there

is an issue of fact regarding Bratton's "permission," it pertains only to their use of the Transit Police logo, a mark not at issue in this litigation, and thus not material to the current claims. Defendants also claim that Mayor Giuliani approved of their selling merchandise.  *See* Susan P. Decl., ¶4.  The basis for this "approval" was that the Mayor "stopped at" their table during a Transit Police family day and "viewed our merchandise without any disapproval." *Id.* ¶3.  Even assuming this assertion had evidentiary value, the Mayor's purported failure to disapprove of Defendants' conduct is not tantamount to permission to use the City's marks.

## B.  Lanham Act - Dilution

Under Section 43 of the Lanham Act, the owner of a mark may be entitled to injunctive relief against another person "who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury."  15 U.S.C. § 1125 (c)(1). Dilution by blurring is an "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." 15 U.S.C. § 1125(c)(2)(B).  Dilution by tarnishment occurs where a trademark "is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context, with the result that the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods." *Hormel Foods Corp. v. Jim Henson Prods, Inc*., 73 F.3d 497, 507 (2d Cir. 1996) (internal quotation marks omitted).

To prevail on this claim, Plaintiff must show "(1) its mark is famous; (2) the defendant is making commercial uses of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark dilutes the quality of the mark by

diminishing the capacity of the mark to identify and distinguish goods and services." *Savin Corp. v. Savin Grp.,* 391 F.3d 439, 449 (2d Cir. 2004).  Defendants are clearly making use of the marks in commerce and such use of identical marks constitutes blurring and impairs the distinctiveness of the City marks within the meaning of this statute.  The City's evidence regarding the fame of its marks is a single paragraph from its counsel's declaration stating that, *inter alia,* the marks are "among the most famous trademarks in the world," that the marks have been "prominently featured in dozens of motion pictures" and television series, and that unspecified "well-known celebrities, actors, athletes, and politicians" wear souvenir merchandise bearing the marks.  Singleton Decl., ¶20.  Defendants do not contest these facts.  There is no evidence, however, regarding *when* the marks became famous and without such evidence, it is impossible to determine whether Defendants' use of a mark predated its fame.  Accordingly, summary judgment on this claim is unwarranted.

## C.  Defendants' Affirmative Defenses and Counterclaim

In this Circuit, "in the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition [to summary judgment] that relevant claims or defenses that are not defended have been abandoned." *Jackson v. Fed. Express.*, 766 F.3d 189, 198 (2d Cir. 2014); *accord Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 143 (2d Cir. 2016) (claims deemed abandoned where plaintiff "fail[ed] to argue that they should survive [defendant's] motion for summary judgment" while arguing against the motion as to his other claims); *Grassel v. Dep't of Educ. of City of N.Y.,* No. 12 CV 1016, 2015 WL 5657343, at *9 (E.D.N.Y. Sept. 24, 2015) ("When a party opposing summary judgment fails to respond to the moving party's argument on a claim, the Court may deem the claim abandoned"); *Thomas v. Atl. Express Corp.*, No. 07 CIV.1978, 2009 WL 856993, at *2 (S.D.N.Y. Mar. 31, 2009) (dismissing plaintiff's

claims with prejudice where "[i]n his opposition, [the plaintiff] failed to respond to [defendant's] argument that his due process claim should be dismissed, and therefore that claim is deemed abandoned"); *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y.2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way").

With the exception of those discussed above, Defendants have not presented any argument regarding defenses they asserted in their Answer, nor have they responded to the City's arguments that the defenses should be denied.  As such, the Court deems those defenses to be abandoned.  In addition, while the City expressly moved for summary judgement on Defendants' counterclaim for cancellation of the trademarks, Defendants did not even reference their counterclaim in their opposition brief let alone address any of the City's arguments.  Accordingly, Defendants' counterclaim is also deemed abandoned, and summary judgment on the counterclaim is granted in favor of Plaintiff.

## IV.  DAMAGES

The City's evidence of infringement submitted in support of its motion consists of the report of an investigator, declarations from its attorney, and supporting photographs.  The photographs show numerous examples of clothing sporting the NYPD Shield, NYPD Mark and FDNY Shield.  *See* Singleton Decl., Exs. G-J.  Despite this ample evidence, as well as Defendants' admissions regarding their sales of the infringing merchandise, determination of damages would be inefficient and premature in light of the remaining claims.  Accordingly, a decision regarding the appropriate measure of damages and attorneys' fees is held in abeyance pending determination of the remaining claims.

## V.  CONCLUSION

For all the foregoing reasons, the City's motion DE [42] is: (1) granted as to the Lanham Act claims for trademark infringement and false designation of origin as to the NYPD Shield, NYPD Mark, and FDNY Shield as used on merchandise from Class 025/Clothing; (2) denied as to the remaining trademark infringement and false designation of origin claims; (3) denied as to the Lanham Act dilution claim; and (4) granted as to Defendants' counterclaim.  The award of damages and/or injunctive relief and attorneys' fees is held in abeyance pending trial on the remaining claim.   Defendants' motion, DE [54] is denied in its entirety, and any defenses not expressly decided herein are deemed abandoned.

**SO ORDERED**.

/s/ *Sandra J. Feuerstein*
Sandra J. Feuerstein
United States District Judge

Dated: January 27, 2020
       Central Islip, New York